[Cite as *Scott v. Durrani*, 2026-Ohio-2433.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

RALPH DAVID SCOTT,           :          APPEAL NO.   C-250426
                                        TRIAL NO.    A-1506865
  and                       :

MISSY SCOTT,                  :

   Plaintiffs-Appellants,    :          *JUDGMENT ENTRY*

  vs.                        :

ABUBAKAR ATIQ DURRANI, M.D., :

   Defendant-Appellee.       :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 6/26/2026 per order of the court.**


**By:**_____
     **Administrative Judge**

[Cite as *Scott v. Durrani*, 2026-Ohio-2433.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


RALPH DAVID SCOTT,                   :          APPEAL NO.    C-250426
                                                TRIAL NO.     A-1506865
   and                           :

MISSY SCOTT,                         :

   Plaintiffs-Appellants,        :          *O P I N I O N*

vs.                                  :

ABUBAKAR ATIQ DURRANI, M.D.,         :

   Defendant-Appellee.           :


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 26, 2026


*Nicholas M. Nighswander, PLLC, Nicholas M. Nighswander, Strauss Troy Co., L.P.A.,* and *Robert R. Sparks*, for Plaintiffs-Appellants,

*Taft Stettinius & Hollister LLP, Philip D. Williamson, Aaron M. Herzig, Russell S. Sayre, Annie M. McClellan, Bonezzi Switzer Polito & Perry Co. LPA, William D. Bonezzi*, and *Sarah E.R. Sandlin* for Defendant-Appellee,

*Calderhead Lockemeyer & Peschke Law Office* and *Bill J. Paliobeis*, for Nonparty-Appellees West Chester Hospital, LLC, and UC Health, Inc.

**CROUSE, Presiding Judge.**

{¶1} Plaintiffs-appellants Ralph David Scott ("David") and Missy Scott (collectively, "the Scotts") appeal from the trial court's entry denying their motion for judgment notwithstanding the verdict and/or a new trial and entering final judgment in favor of defendant-appellee Dr. Abubakar Atiq Durrani.

{¶2} In this appeal, the Scotts argue that the trial court erred in denying their motion for judgment notwithstanding the verdict and/or a new trial on multiple grounds, that the trial court erred in denying their Evid.R. 404(B) motion to introduce prior bad acts committed by Durrani in the form of three published opinions from the First District Court of Appeals, and that the trial court erred in quashing a subpoena that they had served on West Chester Hospital, LLC, and UC Health, LLC, ("WCH-UCH").

{¶3} For the reasons set forth in this opinion, we find the Scotts' arguments to be without merit and affirm the trial court's judgment.

## I. Factual and Procedural History

{¶4} This case has a lengthy procedural history. The Scotts first filed a medical-malpractice action against Durrani, the Center for Advanced Spine Technologies, Inc., ("CAST") and WCH-UCH in 2013 in Butler County. They voluntarily dismissed that action in December 2014.

{¶5} On December 16, 2015, the Scotts filed a medical-malpractice complaint against the same defendants in Hamilton County. The refiled complaint alleged that Durrani had performed six surgeries on David from October 2006 to September 2011. As relevant to this appeal, the complaint asserted claims against Durrani for negligence, lack of informed consent, battery, and fraud. It generally alleged that Durrani had negligently misrepresented the condition of David's spine and his need

for surgery, that Durrani had performed unnecessary and contraindicated surgery on David, and that Durrani had failed to competently perform the surgery.

### A. *Statute-of-Repose-Related Dismissal and Appeals*

{¶6} Motions for judgment on the pleadings were filed by WCH-UCH and by Durrani and CAST. The motions argued that the Scotts' claims were barred by the statute of repose in R.C. 2305.113. The trial court found the motions to be well taken and granted judgment on the pleadings to both sets of defendants.

{¶7} The Scotts appealed, and their appeal was consolidated for opinion purposes with the appeals of several other plaintiffs also challenging statute-of-repose-related dismissals of claims against Durrani. *See McNeal v. Durrani*, 2019-Ohio-5351 (1st Dist.). In *McNeal*, we reversed the trial court's dismissal of the Scotts' claims, holding that the Scotts' "initial complaint was filed within the statute of repose and Ohio's 'savings statute' saved the subsequent complaint." *Id.* at ¶ 1. We held the remaining assignments of error asserted by the Scotts to be moot. *Id.* at ¶ 28.

{¶8} Durrani and CAST appealed to the Ohio Supreme Court. In *Scott v. Durrani*, 2020-Ohio-6932, ¶ 1, the Court reversed our decision on the authority of *Wilson v. Durrani*, 2020-Ohio-6827, which had held that the savings statute in R.C. 2305.19(A) *did not* serve as an exception to extend the statute of repose. The Scotts' case was remanded for this court to consider the arguments that we had previously deemed moot. *Id.*

{¶9} On remand, we held that because Durrani had absconded to Pakistan in December 2013, the tolling statute in R.C. 2305.15(A) tolled the statute of repose and allowed the Scotts' claims to proceed against Durrani. *Scott v. Durrani*, 2021-Ohio-4740, ¶ 5 (1st Dist.) ("*Scott II*"). But we further held that the tolling provision did not apply to the claims against the remaining defendants, and we affirmed the trial court's

grant of judgment on the pleadings to those defendants. *Id.* at ¶ 6 and 15. We reversed the trial court's grant of judgment on the pleadings as to Durrani and remanded for further proceedings. *Id.* at ¶ 15.

### B. *Subpoena-Related Filings*

{¶10} After the case was returned to the trial court, the Scotts served a subpoena duces tecum on WCH-UCH. The subpoena sought the production of "[a]ll documents reflecting the dates and reasons for the suspension of surgery privileges of Abubakar Atiq Durrani, M.D.," as well as all of Durrani's credentialing applications.

{¶11} WCH-UCH (now nonparties to the action) filed objections and a motion to quash the subpoena. They argued that the subpoena sought to discover privileged material and that it was overly broad, unduly burdensome, and prejudicial. They filed an affidavit from Ann Shelley in support of the motion to quash.

{¶12} The Scotts opposed the motion to quash, arguing that they had a substantial need to know whether Durrani's surgical privileges had been suspended and if any date of suspension corresponded to the date of David's surgeries. They further argued that their requests were not covered by the peer-review privilege. In support, the Scotts attached an affidavit from John Richard Ludgin, a former Chief Medical Officer for a health-care system in Wisconsin.

{¶13} WCH-UCH filed a motion to strike Ludgin's affidavit, arguing that Ludgin's testimony constituted improper extrinsic evidence and lacked any foundation.

{¶14} The trial court denied the motion to strike the affidavit. It stated that it would "give the affidavit whatever weight it merits." The court subsequently issued an order requiring WCH-UCH to produce certain documents for an in camera inspection.

{¶15} The trial court ultimately granted the motion to quash the subpoena.

The trial court held that "Ludgin's affidavit is entitled to little if any weight," and that the information sought by the Scotts was confidential information pursuant to the peer-review privilege statute in R.C. 2305.252(A) and not subject to disclosure by way of discovery.

### C. Additional Pretrial Motions

{¶16} The Scotts filed an Evid.R. 404(B) motion. They asked for permission to introduce at trial three published civil cases from this court regarding Durrani, specifically *Adams v. Durrani*, 2022-Ohio-60 (1st Dist.), *overruled on other grounds by Fenner v. Durrani*, 2025-Ohio-4477 (1st Dist.); *Setters v. Durrani*, 2020-Ohio-6859 (1st Dist.); and *Pierce v. Durrani*, 2015-Ohio-2835 (1st Dist.). They argued that these cases were admissible to prove (1) Durrani's practice and common plan to strike fear in patients so that they would allow him to perform unnecessary surgeries, (2) absence of accidental or simple mistake during the cervical spine fusion performed on David, and (3) Durrani's motive, opportunity, knowledge, and intent to defraud and mislead patients to allow him to perform unnecessary surgeries.

{¶17} Durrani opposed the Evid.R. 404(B) motion. He argued that the three First District opinions constituted inadmissible character evidence, pertained to collateral issues in the case, and were not relevant. If the opinions were relevant, Durrani contended, they were unfairly prejudicial.

{¶18} The trial court denied the Scotts' Evid.R. 404(B) motion. Although it found that the opinions were relevant to show "the existence of the required mental state" of Durrani, specifically his intent to defraud and mislead patients so that they would allow him to perform unnecessary surgeries, it determined that the danger of unfair prejudice from admission of this evidence substantially outweighed its probative value.

6

{¶19} The Scotts filed a motion in limine, which, as relevant to this appeal, sought to prevent Durrani's experts from offering evidence as to Durrani's state of mind or what he meant or intended by his notes in David's medical records. Durrani, in turn, argued that his experts should be allowed to make inferences based on the evidence in the record and their personal knowledge.

{¶20} The trial court issued the following ruling: "We're going to let the jury draw the inferences, if appropriate. The other thing I will say is that if they're looking at the records this is what Dr. Durrani wrote. This is what he said. This is the surgery that he recommended. In your professional opinion is that an appropriate recommendation? Is that the correct diagnosis, in your opinion, yes or no? Any other comments or inferences, that's for the jury to draw."

### D. The Jury Trial

{¶21} The Scotts' claims against Durrani were tried to a jury. The trial focused on only two of the surgeries that Durrani had performed on David, specifically a C7-T1 fusion performed on September 8, 2010, and a C1-2 fusion performed on September 9, 2011.

#### 1. Transcripts, or Lack Thereof

{¶22} The Scotts have not provided this court with a full transcript of the trial. Rather, only portions of the trial have been transcribed for appellate review. The Scotts have included in the record transcripts of the pretrial discussion on their motion in limine and the court's related ruling, as well as the testimony of David, his expert Dr. William Tobler, and defense expert Dr. Patrick McCormick. A transcript of the parties' discussion concerning questions submitted by the jury during deliberations has also been provided.

{¶23} The parties' appellate briefs indicate that trial testimony was also

7

presented from Missy Scott, orthopedic surgeon Dr. Dale Dalenberg, clinical psychologist and vocational expert Dr. Kenneth Manges, and neuroradiologist Dr. Derk Purcell. Dr. Dalenberg and Dr. Manges testified as experts for the Scotts, while Dr. Purcell testified as an expert for Durrani.

### 2. Evidence Presented at Trial

#### a. Durrani's Records

{¶24} With respect to the C7-T1 fusion that Durrani performed on David in 2010, Durrani's records established that he met with David on July 6, 2010, and that David complained of pain in his neck, headaches, pain shooting down his left arm, and numbness and tingling in his fingers. David had received two epidural steroid injections but had obtained no relief. Durrani ordered an MRI of David's cervical spine.

{¶25} Durrani saw David again on July 20, 2010. The records from that visit indicate that the ordered MRI had been obtained and showed that David had severe spinal stenosis at the C7-T1 levels, as well as bilateral foraminal stenosis. Durrani stated that these findings corresponded to David's clinical symptoms and recommended surgery because David had exhausted nonoperative means.

{¶26} With respect to the C1-2 cervical fusion, Durrani's records established that he met with David on March 10, 2011, and that David complained of neck pain and headaches. Durrani ordered an MRI of the cervical spine.

{¶27} David had a follow-up visit with Durrani on March 17, 2011. Durrani's records from that visit indicate that the MRI showed that David had a "large pannus behind the body of the C2" in the area where he was complaining of pain. Durrani recommended that David receive an occipital nerve block.

{¶28} David returned to see Durrani on June 23, 2011. Durrani's records from

8

that visit indicate that David obtained some relief from the occipital nerve block, but that the pain returned when the block wore off. David reported frequent occipital headaches and occipital pain. The records stated that David had a "huge pannus behind C2 indicating C1-C2 instability," and that "[f]lexion/extension/rotation in that area is extremely painful." Durrani ordered a flexion-extension MRI of David's cervical spine and a 3D rotary study, and recommended David receive a C1-C2 fusion.

{¶29} Durrani's notes from a July 21, 2011 visit with David indicated that David's "symptoms have significantly deteriorated." Durrani stated that he had reviewed the images that he had previously ordered and that David "has a very significant compression of the brain stem right behind the C2." The records discussed measurements that Durrani had taken, stating, "The cleido clivus angle is about 174 degrees, which changes significantly between flexion and extension. The dens clivus distance is about 10 mm and goes to 12 mm between flexion and extension. The Grubbs Oak distance is about 9 mm."

b. David's Testimony

{¶30} David testified that his back pain first appeared in 2005 after he fell in the shower. He was referred to Durrani, who performed an L5-S1 fusion on him in 2006. David obtained relief from that surgery but subsequently reinjured his back doing aqua therapy. Durrani performed another fusion on David in 2008. David explained that Durrani later performed three spinal surgeries on him in 2010 and one in 2011.

{¶31} David's testimony established that prior to each surgery, Durrani would review medical images that he had ordered and tell David that the only way to fix his back issues was to operate. David stated that other than referring him to a pain-management doctor, Durrani never provided him with a nonsurgical option.

9

According to David, before he agreed to the final fusion surgery in 2011, Durrani told him that, without surgery, he would die or become paralyzed if he were to be involved in a car accident or ride a rollercoaster.

{¶32} David testified that Durrani never explained the risks or benefits of any particular surgery before having him sign a consent form. He also stated that after his first surgery, he did not read the consent forms.

{¶33} David explained that he ended contact with Durrani in 2012. At that time, he had called Durrani's office for a refill of his pain medication, and a nurse told him that he had Ehlers-Danlos Syndrome ("EDS") and needed to pursue pain management. David stated that he had never heard of EDS, and when he asked the nurse to explain what EDS was, she "shut him down." David subsequently requested his surgical records from the hospital and noticed that statements Durrani had made during office visits did not correspond with information in the records. David also testified that he researched EDS and discovered that he had none of the correlating symptoms.

{¶34} David testified that after his last surgery with Durrani, he suffered from intense headaches and numbness in his face and arm. His primary-care physician referred him to Dr. William Tobler at the Mayfield Institute. Dr. Tobler operated on David in 2013 to remove the hardware that Durrani had placed in his cervical spine during the 2011 surgery. David subsequently received some relief from his headaches.

{¶35} David stated that he copes with his pain on a daily basis by taking anti-inflammatories and medical marijuana.

c. Dr. Tobler's Testimony

{¶36} Dr. Tobler testified that he met with David for the first time in February 2013, and that David presented with pain in his neck, neurologic weakness in his left

arm, a painful range of motion in his spine, and significant sensory deficits in his maxillary and mandible areas. Dr. Tobler ordered a vascular angiogram, which showed that David's blood-vessel flow from his neck to brain was normal, but that a C2 screw was partially compromising the opening for David's vertebral artery to wind through the cervical spine.

{¶37} Dr. Tobler performed surgery in April 2013 to remove the hardware that had been placed in David's cervical spine at the C1 and C2 levels. He stated that the screws at those levels were not embedded in the bone and did not lock down the motion of the spine. Dr. Tobler testified that he would not have recommended or performed the C1-2 fusion on David. He also testified that Durrani's use of a unilateral fixation was a breach of the standard of care.

{¶38} Dr. Tobler was asked why the hardware had been placed at that level, and he responded, "The intent of fusing his neck was because of the diagnosis of instability and failure of conservative treatment." He further stated, "It was my opinion that there was no gross instability in his cervical spine."

{¶39} Dr. Tobler's testimony addressed various notes and records that Durrani had made prior to the C1-2 fusion on David. He stated that, in his view, the pannus that Durrani had described as "huge" was actually very tiny and was not compressing the brain stem. He also found no evidence of instability. Dr. Tobler explained that a pannus may indicate inflammation, but that it does not measure or confirm any instability. He further testified that the radiologist who read David's medical images did not note any significant problems with the C1-2 area of David's spine and made no mention of a pannus.

{¶40} Dr. Tobler testified that Durrani had improperly relied on a measurement referred to as the Clyde Clivus Angle when deciding to perform a C1-2

11

fusion. According to Dr. Tobler, this measurement refers to the orientation of the skull as it attaches to the first cervical vertebrae and is not relevant in determining whether a C1-2 fusion is necessary. He also criticized Durrani's use of the Grabb Oakes measurement, a measurement used to determine how thick the pannus is. He stated that Durrani had found the Grabb Oakes measurement to be nine millimeters, when it was actually only four or five millimeters.

{¶41} Dr. Tobler was critical of Durrani's use of a rotational CT scan to determine whether there was instability requiring surgery at C1-2. He stated that lateral-flexion-extension cervical-spine film was more appropriate to assist in making this determination. Dr. Tobler was also critical of Durrani's treatment of David after the 2011 cervical fusion when David complained of headaches and numbness on the left side of his face and in his left hand. Dr. Tobler stated that these were not normal findings following the surgery that had been performed, and that Durrani should have investigated further and performed a neurovascular diagnostic study.

d. Dr. McCormick's Testimony

{¶42} Dr. McCormick testified that Durrani met the standard of care in his treatment of David and that it was reasonable to recommend the C7-T1 and C1-2 fusions based on David's clinical presentation. He testified that David received a benefit from C7-T1 fusion and a temporary benefit from the C1-2 fusion.

{¶43} Dr. McCormick stated that the medical images obtained prior to the C7-T1 fusion showed a moderate compression of nerve roots. He testified that Durrani conducted the C7-T1 fusion with the care and skill of a reasonably prudent spine surgeon, and that David's bones fused properly.

{¶44} Dr. McCormick testified about Durrani's notes with respect to his treatment of David leading up to the C1-2 fusion. He stated that he would not have

used the word "pannus" to describe what was depicted on David's medical images, but would have referred to it as "fullness of soft tissue." He also stated that "huge" would not have been the adjective that he used to describe the pannus. He testified that Durrani had a reasonable basis for recommending the C1-2 fusion, and that a diagnosis of C1-2 instability was within the standard of care and was supported by the imaging studies and David's clinical symptoms.

{¶45} Dr. McCormick testified that Durrani only placed screws on the left side of David's spine during the surgery because he had a concern about the right vertebral artery. Instead of placing screws on the right side of David's spine, Dr. McCormick explained, Durrani decorticated the bone and placed a graph. Dr. McCormick testified that this was within the standard of care.

{¶46} On cross-examination, Dr. McCormick was asked if David was in danger of death or paralysis because he had not had the C1-2 level fused again after the hardware placed by Durrani was removed by Dr. Tobler. Dr. McCormick answered in the negative, stating that with rotational instability, it is the severity of the pain that leads to surgery. Plaintiffs' counsel then asked Dr. McCormick to identify where in Durrani's records he used the term "rotational instability." Dr. McCormick answered, "Well, I mean, his hands-on examination was just turning the head; that's all I can think of, other than ordering a rotational study."

{¶47} Dr. McCormick also testified on cross-examination that he does not rely on the Clyde Clivus Angle to determine whether to operate at the C1-2 level. When questioned about whether David suffered from EDS, he testified that he thinks the records may have mentioned it, but that he did not recall Durrani doing any diagnostic workup. And when he was asked if Durrani "overread" medical images, he responded, "all I can say is that the way he uses adjectives, I don't use them the same way for sure.

13

But I would say at 7-1 he was absolutely accurate in reading it the way he did, and his surgery was helpful. And the C1-2, there's definitely a rotational instability there."

### 3. Jury Questions

**{¶48}** During deliberations, the jury asked three questions. As relevant to this appeal, the jury asked, "Do we have access to Dr. Tobler's transcript? If not, can we confirm whether or not Dr. Tobler admitted Dr. Durrani violated the standard of care?"

**{¶49}** The parties disputed the content of Dr. Tobler's testimony about whether Durrani violated the standard of care. The trial court had the court reporter review the transcript "and get the specific question and answer with respect to the 2011 surgery." Off the record, the court reporter read a portion of the transcript to the court and counsel. The trial court then stated, "His answer was that he would not have performed the surgery." The Scotts' counsel argued that the jury should be allowed to read the transcript. But Durrani's counsel argued that the jury should be told to rely on its collective memory. The trial court stated that it would tell the jury, "Dr. Tobler stated he would not have performed the surgery," and he sent that precise response in answer to the jury's question.

### 4. Verdict

**{¶50}** The jury returned interrogatories finding that Durrani was not negligent, did not fail to acquire informed consent, did not commit battery on David, and did not fraudulently misrepresent the necessity for surgery. A verdict was entered for Durrani.

### 5. Post-trial Motion

**{¶51}** The Scotts filed a motion for judgment notwithstanding the verdict and/or a new trial. As relevant to this appeal, they argued that the weight of the

evidence, when viewed most strongly in favor of Durrani, supported a finding that Durrani had fraudulently misrepresented the need for surgery. The Scotts asked the court to grant judgment notwithstanding the verdict on the fraudulent-misrepresentation claim.

{¶52} The Scotts also argued that the trial court committed plain error in answering the jury's question about Dr. Tobler's testimony. They contended that in addition to telling the jury that Dr. Tobler would not have recommended or performed the C1-2 fusion, the court should have also told the jury that Dr. Tobler testified that Durrani's performance of a unilateral fixation on David was a breach of the standard of care. This testimony was elicited on the cross-examination of Dr. Tobler.

{¶53} The Scotts next argued that the trial court erred in denying their Evid.R. 404(B) motion to introduce evidence of Durrani's prior bad acts via three First District opinions, specifically, evidence of Durrani's prior use of scare tactics to fraudulently induce surgery in *Pierce* and *Adams*, and evidence of Durrani's prior use of an EDS diagnosis to fraudulently induce surgery in *Setters*.

{¶54} The trial court denied the Scotts' motion for judgment notwithstanding the verdict and/or a new trial on all grounds.

{¶55} The Scotts now appeal.

## II. Analysis

{¶56} In their first assignment of error, the Scotts argue that the trial court committed reversible error by denying their motion for judgment notwithstanding the verdict and/or a new trial.

{¶57} A motion for a new trial pursuant to Civ.R. 59(A) may be granted for a variety of reasons, and the scope of our review is dependent upon the argument advanced in the motion. *Ravenscraft v. Durrani*, 2025-Ohio-2900, ¶ 95 (1st Dist.).

15

Where the trial court's exercise of its discretionary authority is challenged, we employ a typical abuse-of-discretion standard of review. But where the motion for a new trial raises a legal issue, we conduct a de novo review. *Id.*

**{¶58}** We review de novo a trial court's ruling on a Civ.R. 50 motion for judgment notwithstanding the verdict. *Courtney v. Durrani*, 2025-Ohio-2335, ¶ 61 (1st Dist.). In doing so, we must view the evidence presented in the light most favorable to the nonmoving party. A Civ.R. 50 motion challenges the sufficiency of the evidence, and it should not be granted unless reasonable minds can reach only one conclusion and that conclusion is in favor of the moving party. *Id.*

**{¶59}** The Scotts raise several arguments under this assignment of error. We address each in turn.

### A. Fraudulent Misrepresentation

**{¶60}** The Scotts first contend that the manifest weight of the evidence presented at trial was sufficient to warrant either judgment notwithstanding the verdict in their favor or a new trial on the claim for fraudulent misrepresentation. Although the Scotts argue for relief under both Civ.R. 50 and 59, we note that it is Civ.R. 59 that governs the relief sought in this situation. Civ.R. 59(A)(6) provides that a new trial may be granted where "[t]he judgment is not sustained by the weight of the evidence."

**{¶61}** As set forth above, the Scotts have not provided a transcript of the entire trial for our review. Notably, the record does not contain a transcript of the testimony offered by two expert witnesses for the Scotts and one expert witness for Durrani.

**{¶62}** The burden to demonstrate error by referring to matters in the appellate record is on the party asserting that the error occurred. *Hartt v. Munobe*, 1993-Ohio-177, ¶ 15. "When the alleged error is that the trial court judgment was against the

16

weight of the evidence or unsupported by the evidence, the appellant must include in the record all portions of the transcript relevant to the contested issues." *Id.*; *accord Lyons v. Kindell*, 2015-Ohio-1709, ¶ 42 (1st Dist.).

**{¶63}** The Scotts argue that the evidence presented, when viewed in favor of Durrani, only allowed for one reasonable conclusion—that Durrani had committed fraudulent misrepresentation. But they have not provided all portions of the transcript relevant to this issue. Because the Scotts have failed to provide all the testimony, including the testimony of three experts, we have no way to review the weight of the evidence. The Scotts argue in their reply brief that the partial transcript provided on appeal contains ample evidence that the jury's verdict was unfounded, and that they have provided all relevant portions of the record that they relied on to challenge the trial court's ruling and jury verdicts. This argument is unpersuasive. Without reviewing all evidence presented, particularly the testimony of the expert witnesses, we cannot determine if the verdict was against the weight of the evidence.

**{¶64}** In the absence of a complete transcript, the Scotts have failed to provide an adequate record for a full manifest-weight review. We accordingly presume the validity of the trial court's proceedings and hold that the Scotts' challenge to the weight of the evidence is without merit. *See Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199 (1980); *WWW.Headhunting.Org, LLC v. Logicalis, Inc.*, 2006-Ohio-2619, ¶ 21-22 (1st Dist.).

### B. Form of Defense Expert Testimony

**{¶65}** The Scotts next argue that the trial court erred in allowing defense experts to give opinions about what "Durrani did not opine and not state in the medical records."

**{¶66}** This argument relates back to the pretrial motion in limine that the

17

Scotts had filed to exclude Durrani's experts from offering evidence on Durrani's state of mind or what he meant or intended by his notes in David's medical records.

**{¶67}** The Scotts argue that it was error and in contravention of the court's ruling on the motion in limine for the court to allow defense expert Dr. McCormick to testify that "rotational instability" was the reason for Durrani to perform the C1-2 fusion when Durrani never noted rotational instability in David's records.

**{¶68}** We need not determine if Dr. McCormick offered testimony outside the bounds of the trial court's ruling. Even if the court erred in allowing Dr. McCormick to testify that David's rotational instability justified the C1-2 fusion, that error would only serve as a basis for reversal if it was not harmless and impacted the Scotts' substantial rights. *Bender v. Durrani*, 2024-Ohio-1258, ¶ 92 (1st Dist.); Civ.R. 61.

**{¶69}** In reviewing for harmless error, the court weighs the prejudicial effect of the error and asks whether the jury probably would have reached the same result had the error not occurred. *Bender* at ¶ 93. Because we have only been provided a partial transcript of the proceedings, we cannot determine whether, in light of the evidence presented, the jury probably would have reached the same result absent testimony from Dr. McCormick about rotational instability. We accordingly presume the validity of the proceedings below and hold that the Scotts' argument is without merit.

### C. Guiding the Jury During Deliberations

**{¶70}** The Scotts' final argument under this assignment of error is that the trial court committed plain error in guiding the jury during deliberations when it failed to provide the jury with the complete testimony of Dr. Tobler on the standard of care.

**{¶71}** As set forth above, the jury sent a question to the trial court during deliberations asking, "Do we have access to Dr. Tobler's transcript? If not, can we

confirm whether or not Dr. Tobler admitted Dr. Durrani violated the standard of care?"

**{¶72}** The trial court directed the court reporter to review the transcript of Dr. Tobler's testimony to "get the specific question and answer with respect to the 2011 surgery." After the court reporter read an excerpt from the transcript to the trial court and counsel, the court told the jury, over Durrani's objection, that "Dr. Tobler stated he would not have performed the surgery." Counsel for the Scotts argued that the jury should be allowed to read the transcript, but the court disagreed.

**{¶73}** After trial, the Scotts realized that Dr. Tobler had given additional testimony on cross-examination regarding whether Durrani had violated the standard of care. Specifically, defense counsel had asked Dr. Tobler, "But all things equal, using unilateral fixation is not a breach of the standard of care?" Dr. Tobler had responded, "I would testify that it is."

**{¶74}** The Scotts now argue, as they did in their motion for a new trial, that the trial court erred in failing to provide this excerpt from Dr. Tobler's testimony to the jury. They concede that, because they did not object below to the trial court's failure to include this testimony in response to the jury's question, they are limited to a plain-error review on appeal. *See Kelley v. Horton*, 2025-Ohio-5252, ¶ 22 (1st Dist.) ("The failure to timely object to an error waives all but plain-error review on appeal."). Plain-error review is not provided for in the Ohio Rules of Civil Procedure. *Jones v. Cleveland Clinic Found.*, 2020-Ohio-3780, ¶ 24. As such,

> the plain error doctrine is not favored and may be applied only in the
> extremely rare case involving exceptional circumstances where error, to
> which no objection was made at the trial court, seriously affects the
> basic fairness, integrity, or public reputation of the judicial process,

thereby challenging the legitimacy of the underlying judicial process itself.

*State ex rel. Target Auto Repair v. Morales*, 2022-Ohio-2062, ¶ 15, quoting *Goldfuss v. Davidson*, 1997-Ohio-401, syllabus.

**{¶75}** While this excerpt from Dr. Tobler's testimony was a direct response to the question that the jury had asked during deliberations, and the trial court should have included it in response to the jury's question, we cannot hold that the failure to do so amounted to plain error. Although this excerpt was omitted from the trial court's response, the jury was still informed that Dr. Tobler testified that he would not have performed the surgery. This was not a direct statement that Durrani's performance of the surgery was a breach of the standard of care, but it indicated that Dr. Tobler had, at a minimum, reservations and concerns about the surgery performed.

**{¶76}** Further, in denying the Scotts' motion for a new trial on this ground, the trial court noted that "Plaintiffs' expert witness, Dr. Dalenberg, testified that Dr. Durrani breached the standard of care for each surgery he performed on Mr. Scott, yet the jury still found for Defendants on all of Plaintiffs' claims." Dr. Dalenberg's testimony has not been provided for our review, so we must accept the trial court's representation. And that representation establishes that, although the trial court failed to provide the jury with Dr. Tobler's statement that performing the surgery was a breach of the standard of care, the jury nonetheless heard that it was a breach from a different expert witness.

**{¶77}** On this record, we cannot hold that the trial court's failure to include this additional excerpt from Dr. Tobler's testimony seriously affected the basic fairness, integrity, or public reputation of the judicial process. *See Morales*, 2022-Ohio-2062, at ¶ 15.

**{¶78}** We accordingly hold that the trial court did not err in denying the Scotts' motion for judgment notwithstanding the verdict and/or a new trial, and we overrule the first assignment of error.

### III. Evid.R. 404(B)

**{¶79}** In their second assignment of error, the Scotts argue that the trial court erred as a matter of law in denying their pretrial Evid.R. 404(B) motion that sought permission to introduce this court's opinions in *Adams, Setters,* and *Pierce*.

**{¶80}** In denying the Scotts' Evid.R. 404(B) motion, the trial court found that the *Adams*, *Setters*, and *Pierce* opinions were relevant to show "the existence of the required mental state" of Durrani, specifically his intent to defraud and mislead patients so that they would allow him to perform unnecessary surgeries. But it found that the danger of unfair prejudice that the admission of this evidence would pose substantially outweighed its probative value.

**{¶81}** Evidence of other crimes, wrongs, or acts is not admissible to show action in conformity therewith. Evid.R. 404(B)(1). But pursuant to Evid.R. 404(B)(2), such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

**{¶82}** To be admissible under Evid.R. 404(B)(2), evidence must be "relevant *to the particular purpose* for which it is offered." (Emphasis in original.) *State v. Hartman*, 2020-Ohio-4440, ¶ 26. "Relevant" evidence is that which has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Hartman* at ¶ 27.

21

Whether evidence is admissible for a nonpropensity purpose is a question of law. *Id.* at ¶ 22.

**{¶83}** If evidence is found to be relevant for a nonpropensity purpose, the trial court must weigh its probative value against its prejudicial effect. *Id.* at ¶ 29. The evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A); *see Hartman* at ¶ 29. This determination by the trial court is reviewed for an abuse of discretion. *Hartman* at ¶ 30.

**{¶84}** The Scotts sought to introduce this court's opinions in *Adams*,[1] *Setters*,[2] and *Pierce*,[3] to establish Durrani's intent, motive, and plan to fraudulently obtain patients' consent for unnecessary surgeries. They argue that these cases are factually similar to the case at bar, illustrate Durrani's use of scare tactics to induce patients to consent to elective surgery, and that each resulted in findings of medical-malpractice liability against Durrani.

**{¶85}** We need not determine whether our opinions in *Adams*, *Setters*, and *Pierce* were relevant for a nonpropensity purpose pursuant to Evid.R. 404(B). This is because even if they were relevant, we find no abuse of discretion in the trial court's determination that the prejudicial effect of the evidence outweighed its probative

---

[1] In *Adams*, 2022-Ohio-60, at ¶ 1 (1st Dist.), we affirmed the trial court's judgment in favor of the plaintiff on multiple claims, including her claims that Durrani was negligent in his medical treatment of her and fraudulently misrepresented the need for surgery. We explained that "Durrani also told [Adams] that she had rotational instability in her cervical spine and could be put on a ventilator or die if the problem were not corrected." *Id.* at ¶ 6. Durrani recommended and performed a C1-2 cervical fusion on Adams. *Id.*

[2] In *Setters*, 2020-Ohio-6859, at ¶ 1 (1st Dist.), we affirmed the trial court's judgment against Durrani on claims of negligence, lack of informed consent, and loss of consortium. We explained that Setters was diagnosed with EDS before she sought treatment from Durrani, that Durrani performed a C1-2 fusion on her, and that the hardware placed in her cervical spine by Durrani had to later be removed by Dr. Tobler. *Id.* at ¶ 2, 5 and 7.

[3] In *Pierce*, 2015-Ohio-2835, at ¶ 42 (1st Dist.), we affirmed the trial court's judgment in favor of Pierce on her medical-malpractice claims against Durrani. We explained that Durrani told Pierce she would be paralyzed if he did not perform surgery on her, that Durrani performed two surgeries on Pierce's C5, C6, and C7 vertebrae, and that Pierce later had surgery with a different doctor to remove the hardware that Durrani had placed. *Id.* at ¶ 3-5.

value. *See Hartman*, 2020-Ohio 4440, at ¶ 29.

**{¶86}** As we have acknowledged, evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Evid.R. 403(A); *see Hartman* at ¶ 29. "[B]ecause anything adverse to a party's case could be deemed prejudicial to that party," Evid.R. 403(A) only requires exclusion of evidence that is unfairly prejudicial. *State v. Worley*, 2021-Ohio-2207, ¶ 125. The Ohio Supreme Court has explained,

> Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.

*Oberlin v. Akron Gen. Med. Ctr.*, 2001-Ohio-248, ¶ 19, quoting *Weissenberger's Ohio Evidence*, § 403.3, at 85-87 (2000).

**{¶87}** The Scotts argue that their attempted use of the *Adams*, *Setters*, and *Pierce* opinions is distinguishable from other cases in which this court has held that the reference to other malpractice actions against Durrani was unfairly prejudicial. *See, e.g., Stephenson v. Durrani*, 2023-Ohio-2500, ¶ 47 (1st Dist.); *Hounchell v. Durrani*, 2023-Ohio-2501, ¶ 60 (1st Dist.). They contend that the references in these earlier cases were to *allegations of malpractice*, whereas they are attempting to introduce *specific judgments of malpractice* affirmed by a reviewing court. The Scotts argue that any danger of unfair prejudice, as recognized in *Stephenson*, is overcome because the malpractice has been legally proven. This is a novel argument.

**{¶88}** In *Stephenson*, we held that "Ohio courts tend to recognize that absent

23

a finding of malpractice, evidence of the existence of a prior medical malpractice case is properly excluded, as unfairly prejudicial." (Cleaned up.) *Stephenson* at ¶ 47. Here, the Scotts are attempting to introduce an actual finding of malpractice. Notably, *Stephenson* did not hold that evidence of a prior finding of malpractice *was* admissible or foreclose the possibility that such evidence could be unfairly prejudicial—it simply held that absent such a finding, evidence of malpractice allegations was unfairly prejudicial. *Id.*

**{¶89}** We find no abuse of discretion in the trial court's determination that, in the case at bar, the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. The trial court found that this evidence would arouse the jury's emotional sympathies and appeal to an instinct to punish Durrani. It further found that this evidence would "draw the jurors' focus away from the question of whether or not Dr. Durrani failed to meet the requisite standard of care in this instance." These were legitimate concerns and reasonable conclusions to draw. We find it difficult to believe that a jury would not be influenced by the introduction of multiple additional findings of malpractice against a defendant doctor.

**{¶90}** We accordingly hold that the trial court did not abuse its discretion in denying the Scotts' Evid.R. 404(B) motion and overrule the second assignment of error.

### IV. Cumulative Error

**{¶91}** In their third assignment of error, the Scotts argue that the "cumulative prejudicial effect of errors by the trial court impacted the jury's assessment of Durrani's credibility and the outcome of the trial[,] requiring the judgment be reversed and a new trial granted."

**{¶92}** We have not found multiple errors in this case. We found error in the

trial court's failure to provide the jury with Dr. Tobler's complete response to the jury's question, but determined that this error did not rise to the level of plain error requiring reversal. Absent a finding of additional error, we cannot find that the cumulative effect of multiple errors warranted a new trial. The third assignment of error is accordingly overruled.

### *V. No Error in Quashing Subpoena*

**{¶93}** In their fourth assignment of error, the Scotts argue that the trial court committed reversible error in quashing the subpoena they served on WCH-UCH.

**{¶94}** They contend that their medical-malpractice claims centered on whether Durrani had privileges to perform surgeries on David from 2008 to 2012, and that the subpoena served on WCH-UCH sought nonconfidential documentation relevant to this claim showing the dates and reasons for any suspension of Durrani's medical privileges.

**{¶95}** The subpoena specifically sought the production of "[a]ll documents reflecting the dates and reasons for the suspension of surgery privileges of Abubakar Atiq Durrani, M.D.," as well as all of Durrani's credentialing applications. WCH-UCH moved to quash the subpoena pursuant to Civ.R. 45, arguing that it sought to discover privileged material, and that it was overly broad, unduly burdensome, and prejudicial. They supported the motion to quash with an affidavit from Ann Shelley, the Director of Medical Staff Services for UC Health who was responsible for maintaining medical staff files and was involved in the peer-review process for physician credentialing.

**{¶96}** In brief summary, Shelley stated that all documents requested by the subpoena were "records within the scope of one or more of the peer review and/or quality assurance committees at West Chester Hospital," that all documents in Durrani's credentialing and medical staff file were generated or specifically considered

by a committee carrying out peer-review functions, and that there were no documents requested by the subpoena "that were not used exclusively for or generated by one of the several peer review and quality assurance committees at West Chester Hospital."

**{¶97}** The Scotts opposed the motion to quash and provided an affidavit from John Richard Ludgin, a former Chief Medical Officer for a health-care system in Wisconsin. In relevant part, Ludgin stated that the subpoena issued by the Scotts "seeks information otherwise available from original sources outside of the peer review process and not generated by the peer review committee about Defendant Durrani for any peer review investigation."

**{¶98}** After considering the competing affidavits and reviewing the documents that it had ordered be provided for in camera review, the trial court granted the motion to quash the subpoena. It found that the information sought by the Scotts was confidential information pursuant to the peer-review privilege statute in R.C. 2305.252(A) and not subject to disclosure by way of discovery.

**{¶99}** The Scotts contend that this determination was in error and that they were entitled to obtain basic information about the competency of Durrani, their treating physician, under R.C. 2305.252.

**{¶100}** We typically review a trial court's discovery order for an abuse of discretion, but we conduct a de novo review when the order involves the application of a law regarding privilege. *Schram v. Masadeh*, 2024-Ohio-1662, ¶ 16 (1st Dist.). The burden of establishing the applicability of a privilege lies with the party asserting the privilege. *Id.*

**{¶101}** Our review of the Scotts' argument implicates Civ.R. 26, Civ.R. 45, and R.C. 2305.252. Civ.R. 26(B)(1) addresses the scope of discovery and provides, in relevant part, "Parties may obtain discovery regarding any nonprivileged matter that

26

is relevant to any party's claim or defense and proportional to the needs of the case." Civ.R. 26(B)(8)(a) addresses claims of privilege and provides, "When information subject to discovery is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim."

**{¶102}** Where a party has sought to subpoena matters that the opposing party believes to be privileged, upon timely motion the trial court "shall quash or modify the subpoena, or order appearance or production only under specified conditions," if the court finds that the subpoena "[r]equires disclosure of privileged or otherwise protected matter and no exception or waiver applies." Civ.R. 45(C)(4)(b).

**{¶103}** While the Ohio Civil Rules discuss when privileged material may be subject to discovery, R.C. 2305.252 guides a determination as to what documents are, in fact, privileged. The peer-review privilege is set forth in R.C. 2305.252(A), which provides that "[p]roceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider."

**{¶104}** A party asserting a peer-review privilege must establish that the documents at issue satisfy the criteria of R.C. 2305.252. *Bansal v. Mt. Carmel Health Sys., Inc.*, 2009-Ohio-6845, ¶ 14 (10th Dist.). This is a two-part burden. The party must first "establish the existence of a peer-review committee as defined by R.C. 2305.25(E)." *Spurgeon v. Mercy Health-Anderson Hosp., L.L.C.*, 2020-Ohio-3099, ¶ 11 (1st Dist.); *accord Bansal* at ¶ 15. The party next "must prove that each of the documents that it refuses to produce is a record within the scope of the peer-review

committee." *Spurgeon* at ¶ 11; *accord Bansal* at ¶ 15. This burden may be met by "(1) submit[ting] the disputed documents to the trial court for an in camera inspection, or (2) present[ing] affidavit or deposition testimony containing the information necessary for the trial court to determine whether the privilege attaches." *Spurgeon* at ¶ 12; *accord Bansal* at ¶ 14.

{¶105} Following our review of the record, we find no error in the trial court's granting of the motion to quash the subpoena. Shelley's affidavit established that WCH-UCH has a peer-review committee. *See Spurgeon* at ¶ 11; *Bansal* at ¶ 15. And while the affidavit did not confirm whether Durrani's surgery privileges had been suspended, it established that any information concerning a suspension of privileges "would have been specifically considered and/or generated by the West Chester Hospital Medical Staff Peer Review and/or Medical Executive Committees" and maintained confidentially within the physician's file. The affidavit further established that all of the documents requested by the subpoena were within the scope of one or more of the peer-review and/or quality-assurance committees and were generated by one of those committees in the course of their peer-review functions. *See id*.

{¶106} Via Shelley's affidavit, WCH-UCH satisfied its burden of establishing that the subpoenaed documents met the criteria of R.C. 2305.252. Further, the trial court did not rely solely on Shelley's affidavit to determine that the requested documents were privileged. Rather, it required that various documents be submitted for an in camera review. After reviewing the submitted documents and considering the information in Shelley's affidavit, the court determined that the requested documents were confidential pursuant to the peer-review privilege.

{¶107} We accordingly hold that the trial court did not err in granting WCH-UCH's motion to quash the subpoena, and we overrule the fourth assignment of error.

### *VI. Conclusion*

{¶108} Having overruled each of the Scotts' assignments of error, we affirm the trial court's judgment in favor of Durrani.

Judgment affirmed.

**BOCK** and **NESTOR, JJ.,** concur.